IN RE ADOPTION OF LARRY GAIL PERKINS AND JERRY LEE PERKINS.

No. 47866.

(Reported in 49 N.W.2d 248)

September 18, 1951.

Rehearing Denied November 16, 1951.

Russell Decker, of Ames, for appellant.

Gerald O. Blake, of Jewell, for appellee.

Wennerstrum, J.—This action involves the adoption proceeding of Larry Gail Perkins and Jerry Lee Perkins, minor children of LaVerne B. Perkins and Florence Perkins, now Green. The mother and father were divorced and the custody of the children was given to the mother, subject to certain conditions. Cass E. Green, to whom the mother of the children was later married, made an application to adopt them. Following a hearing in which LaVerne B. Perkins resisted the application, a decree of adoption was entered granting to petitioner the rights of an adoptive parent. The father of the children has appealed from the decree entered.

The parents of the children involved in this action were married in December 1935. To this union two children were born, Larry Gail Perkins on March 27, 1938, and Jerry Lee Perkins on September 3, 1941. Mr. Perkins was in the Army at the time of the marriage and so continued until after the close of hostilities of World War II. In February 1949, Mrs. Perkins brought an action for divorce. In this proceeding the husband and wife were represented by counsel and as a result of negotiations between the parties and their representatives, a stipulation was entered into which provided that in case a divorce was granted, Mrs. Perkins was to have custody of the children and that Mr. Perkins was to pay $60 per month for their support,

"* * * the first such payment to be made on the fifth day of the month following the obtaining of a decree herein, and a like amount on the fifth day of every month thereafter until the youngest child reaches the age of eighteen years, graduates from high school, or reaches his majority, or in the event plaintiff remarries, whichever occurs first." It was also provided that Mrs. Perkins should be given the ownership of a certain residence property in Ames, Iowa, upon which there was a mortgage. Upon trial of the divorce action a decree was entered in conformity with the stipulation agreed upon by the parties.

Subsequent to the signing of the divorce decree on March 18, 1949, the appellant herein, LaVerne B. Perkins, paid into the office of the Clerk of the District Court of Story County, Iowa, $60 for each of the following months: April, May, June, July and August, 1949. Florence Perkins and the petitioner-appellee were married in Missouri on September 12, 1949. Since that time they have lived, with the two boys, on a farm west of Jewell. The farm of the appellee, Green, comprises a quarter section of land which, he testified, is mortgaged for less than fifty per cent of its value. He also stated that his stock and farm equipment are not mortgaged. The mother, Florence Perkins Green, filed in this action a consent to the adoption of her children by her present husband. Notice of the pendency of the petition for adoption was served on LaVerne B. Perkins, the appellant herein, on October 4, 1950, and thereafter he filed a resistance in this proceeding wherein he alleges that he has not failed to carry out the terms of the stipulation, the provisions of which were later incorporated in the divorce decree; that he has not abandoned the children nor waived nor relinquished any right for their care or control; that he does not consent to the proposed adoption; that Florence L. Perkins Green has violated said decree by refusing to allow the appellant herein reasonable rights of visitation and has, in fact, secreted the children from him. He asks that the petition for adoption be dismissed at the cost of the petitioner.

In addition to the facts heretofore set forth, the record shows that the children are attending the Jewell Public Schools. The petitioner testified that he knew that under the terms of the divorce decree Mr. Perkins' obligation to contribute to the sup-

port of the children would cease upon his marriage to the former Mrs. Perkins. He also testified that Mr. Perkins "* * * has visited the children once since they have been in my home. * * * He has attempted to visit them at other times. It is true that at those additional times when he attempted to visit the children that I would not allow him on the place." The petitioner-appellee also testified that Mr. Perkins had bought a Palomino pony for one of the boys which was delivered to the Green farm. This pony was later sold by Mr. Green for $85. He stated that this money was invested in a cow and calf. In his testimony, however, he admitted that he bought the cow with a part of the boys' money and a part of his own money. It is his claim, however, that the children's money is in the bank, although he stated that he does not have a separate bank account in their name. When asked whether on several occasions he had refused to allow Mr. Perkins to come on the farm, he answered: "No, I never refused to let him come on the farm, and my wife said he wasn't wanted there and I agreed with her in his presence."

The father was given the right under the decree to visit the children at reasonable times. Relative to this matter the mother testified: "Yes, I said he couldn't come."

In the adoption hearing the father of the boys testified that he terminated the payments after August 1949 because he was told that his former wife had remarried. He stated that he would have made another payment if he had known that she did not get married until in September and that he was ready and willing to make the payment due in September and that he wants to comply with the decree.

It is also shown by the testimony of the appellant, Perkins, that the equity in the home property at the time of the divorce decree was approximately $1900. He also stated that he did not want the children adopted because under those conditions he would not have the right to see them. In his testimony he stated:

"I want the court to understand that I would like to have those children stay as my children with my name. I would like to have the opportunity of doing for those children whatever I can and whatever Mrs. Green will allow me to do for them. I would like to have the right to visit those children."

It is shown that the appellant is employed as a mail and freight handler by the Chicago and Northwestern Railway Company at Ames and that he has never been discharged or laid off for intoxication or for any other reason. He stated that he feels he has a permanent job. It is also shown by the record that he has several thousand dollars worth of life insurance and that the children are named as beneficiaries of most of these policies.

There was other testimony in the record, much of which pertained to conditions existing at or prior to the time of the divorce and which involved claimed misconduct on the part of both Perkins and his former wife. However, these facts have no bearing on the particular matter before us.

▇ I. It is said that adoption proceedings are cognizable neither at law nor in equity. 2 C. J. S., Adoption of Children, section 34, page 415. However, the rule seems to be established in Iowa that the procedure is governed generally by equitable rules. Specifically, and of importance in this case, upon appeal the cause is triable de novo. In In re Adoption of Karns, 236 Iowa 932, 939, 20 N.W.2d 474, 478, in discussing the question of what was for the best interest of the children, we said: "Nor are we prepared to interfere with the trial court's finding on this issue." Again on page 940 of 236 Iowa and at page 478 of 20 N.W.2d, we said: "The finding of the trial court is, of course, entitled to weight and it had some discretion in deciding this issue."

These statements are evidence that this court could and should review the facts as well as the law; in other words, try the case de novo.

A close analogy appears also in the numerous habeas corpus cases we have considered which involve child custody. In these cases we have for many years uniformly held that equitable procedure is to be followed. Watt v. Dunn, 236 Iowa 67, 73, 17 N.W.2d 811; Wooley v. Schoop, 234 Iowa 657, 658, 12 N.W.2d 597, 598; Barnett v. Blakley, 202 Iowa 1, 5, 209 N.W. 412. The reason for rule, which applies in adoption matters as forcefully as in the class of habeas corpus causes previously referred to, is well stated by Justice Evans in Jensen v. Sorenson, 211 Iowa 354, 367, 233 N.W. 717, 723, where it is stated:

"Where the issue turns upon the best welfare of the child, and involves the overturning of presumptive parental rights in the interest of the child, we have found it difficult to separate questions of law from questions of fact * * *. We have necessarily recognized the fact that the determination of such issues carries us into the field of equity, and that it is indispensable that principles of equity be applied."

■ II. By reason of the statements heretofore made we proceed to consider the instant cause de novo. This requires a review of the evidence and a consideration of the question of the best interest of the children. The parties agree that this is the matter for primary consideration. We have often so held. In re Adoption of Karns, supra; In re Adoption of Burkholder, 211 Iowa 1222, 1226, 233 N.W. 702. Sections 600.1, 600.2 and 600.5, 1950 Code, which are part of our present adoption statutes, all support this view.

The record shows that one of the children involved is now thirteen years of age, the other approximately ten. Both are boys. There is some evidence relative to drinking by all three adult parties concerned in this case. The divorce decree gave the custody to the mother with the father having rights of visitation. The question which we must determine at this point is whether it will be for the best interest of these boys if the adoption be permitted, in which case they will certainly be denied all association with their father; or whether the disadvantages of such a course outweighs the advantages and the adoption should be denied. We are not at this juncture concerned with whether the consent of the father is required; nor, as both the trial court and the appellee seem to think, with a question of custody as between the mother and the father. Admitting, for the purpose of argument, that the consent of the father is not essential, yet we are still confronted with the problem of what is for the best interest of the children. We have concluded that the welfare of the boys here involved will be best served if the adoption is denied.

■ In favor of the adoption is the matter of the inheritance from the petitioning adopting father. 2 C. J. S., Adoption of Children, section 39b2, page 425. But against it is the law of

the natural and healthy relationship which they will otherwise have with their father; the disdainful attitude of the mother and her present husband toward the Iowa law which prohibits remarriage after the divorce within one year; and toward the court's decree in the divorce action which granted the appellant the right to visit his sons; the comparatively short time that the proposed adoptive father and mother of the children have been married; and the interest of the appellant in his sons. The fact that the children are boys of ages at which the need of a father's guidance and companionship is increasingly important must also be taken into consideration. We held in In re Adoption of Chinn, 238 Iowa 4, 9, 25 N.W.2d 735, the right of visitation in itself is not enough to require the refusal of a petition for adoption, yet we think that the fact that such right will be eliminated by an adoption decree is a proper consideration when we are approaching the problem from the standpoint of the welfare of the children.

We are not unmindful of the finding of the trial court upon this question, nor that we have often said that such finding is entitled to weight. In re Adoption of Karns, supra; Ellison v. Platts, 226 Iowa 1211, 1215, 286 N.W. 413. Many other cases could be cited to the same effect. We still have the duty to weigh the evidence and to determine whether the trial court arrived at the correct conclusion. Here, the trial court's determination is considerably weakened in its effect by its apparent thought that in some manner the custody of the children was involved. In its findings of fact and conclusions of law, it stated:

"* * * The petitioner and the mother have a home and they possess ample means for the care and education of the children with suitable and satisfactory surroundings for their physical and moral development. The natural father, while he says he has affection for the boys, has neither the surroundings nor the background to give them the education, supervision, training or home life so necessary to them."

Counsel for the petitioner, the appellee herein, has followed the court down this misleading road and argues strenuously that the natural father has no adequate home. No such question is involved. LaVerne Perkins is only attempting to save his right

of visitation, of intermittent companionship and to have his sons bear his name. He is not seeking a change in the custodial terms of the divorce decree. A denial of the adoption will still leave the boys with their mother and stepfather; and we must assume, in view of the record, that they will have the same care and affection that they would have if the adoption decree were permitted to stand.

III. Another consideration requires a reversal of this case. At the time of the divorce, LaVerne Perkins gave to his wife household furniture of the value of at least $500, perhaps more, if his own valuation is to be taken. He also deeded to her his interest in their homestead. She later sold it, after some repairs, for $8500 subject to a mortgage previously given. This left an equity in the property concerning which we have previously made reference. These benefits were in addition to the liability of the appellant herein under the decree for the payment of $60 per month for the support of the children which terminated upon Mrs. Perkins' remarriage. The divorce decree is silent on the question whether the equity in the home and the value of the furniture were turned over to Mrs. Perkins as alimony or to aid in the support of the children. Necessarily, however, she needed a home and she needed furniture to keep together the family which the divorce decree awarded her. These things were of value to her in caring for her sons. Can it now be said that she, while retaining the furniture and the proceeds of the home, had the sole care and is alone providing for the wants of the children? Lump sum payment, either in money or property, is just as much a contribution to the support of minors as are monthly allowances. The situation here is ruled by Rubendall v. Bisterfelt, 227 Iowa 1388, 291 N.W. 401. Although in a preceding division we discussed the question as though the consent of the natural father was not essential, yet we think that the Rubendall case, supra, requires a holding that it was necessary under the facts in the present case and that no adoption could have been had without it. It should be recalled that in the present case the notice was given to LaVerne Perkins of the proposed adoption.

IV. The burden of proof is upon a petitioner in an adoption proceeding to establish the facts justifying the adop-

tion. 2 C. J. S., Adoption of Children, section 39a, page 424; In re Rice, 179 Wis. 531, 534, 192 N.W. 56, 57. In the instant case it is our conclusion that the petitioning stepfather has not met the burden of proof showing that it was to the children's best interest to be adopted by him.

By reason of the statements heretofore made and our particular concern for the preservation of the family relationship where they appear for the best interest of the children, we have concluded that the cause should be reversed and remanded for the entry of a decree in conformity with this opinion.—Reversed and remanded.

BLISS, MANTZ, HAYS, and THOMPSON, JJ., concur.

MULRONEY, J., concurs in result and specially.

SMITH and GARFIELD, JJ., and OLIVER, C. J., dissent.

MULRONEY, J. (specially concurring)—I concur in the reversal of this case. My views in such a case as this have been expressed in my dissent in In re Adoption of Chinn, 238 Iowa 4, 25 N.W.2d 735. While the question of the best interests of the child is of paramount importance in a child-custody case, it is not in my opinion the first question in an adoption case. Adoption is based upon consent of the natural parents or the loss of the right to veto by a natural parent. I still do not believe the mere award of custody to one parent in a divorce action dispenses with the necessity of obtaining the consent of the parent out of custody.

Under the evidence here we must presume the divorce court made an award of custody that was for the best interests of the children. If it is not for their best interests it can be changed under the continuing jurisdiction of the divorce court. The father is in substantial compliance with the divorce decree. I feel no valid adoption could be obtained without the father's consent. I do not think the question of the best interests of the children, already decided by the divorce court, is reached. I would reverse on the ground that under the law and under the evidence in this case the father's consent to the adoption was necessary and the father's consent not having been given, no legal adoption could be effected.

SMITH, J. (dissenting)—It appears to me there are just three questions necessary to be considered: (1) Was the father's consent required? (2) Is the case triable de novo on appeal? And (3) Is the judgment of the trial court supported by substantial evidence?

I would answer (1) and (2) in the negative and would say "yes" to (3).

I. Section 600.3, Iowa Code 1950 and I. C. A., provides: "The consent of both parents shall be given to such adoption * * * unless [they] are not married to each other * * *. If not married to each other, the parent having the care and providing for the wants of the child may give consent."

Under this plain language the consent of the father here was unnecessary unless he both cared for, *and* provided for the wants of, the child. This or substantially equivalent language has been in the statute since 1858. See section 2601, Revision of 1860. We have construed it as meaning that the consent of both is necessary unless one parent is providing for the child's wants "to the exclusion of the other." Rubendall v. Bisterfelt, 227 Iowa 1388, 1390, 291 N.W. 401, 402.

Clearly the situation here does not bring resistor (the father) within the scope of even that liberal interpretation. The "care and custody" was expressly awarded to the mother by the divorce decree. True, the father was to pay $60 per month for the "support, maintenance and education of the children" but that obligation was to terminate upon remarriage of the mother; and the payments had legally and actually terminated long before the adoption proceeding was started. The resistor was then in practically the same position as was the father in In re Adoption of Chinn, 238 Iowa 4, 25 N.W.2d 735.

Division III of the majority opinion suggests that the award (in the divorce decree) of the homestead and household goods to the wife might bring the case within the rule of Rubendall v. Bisterfelt, supra. There seems no sound basis for that suggestion. The divorce stipulation and decree reveal no such intent. Resistor's duty to his children was (at his own insistence) measured and limited by the $60 monthly payments to their "support, maintenance and education * * * *until the plaintiff* [their

mother] remarries." There is no hint in the record of the divorce proceedings or in this record or in appellant's argument that the award to the wife was intended as a provision for the children.

It should be pointed out the recent addition to section 600.4, Code 1946, I. C. A., requiring notice of hearing (on an adoption petition) to be given "a divorced parent not having custody of the child" (chapter 281, section 4, Acts of the Fifty-second General Assembly) does not change the provisions for required parental consent found in Code section 600.3. The amendment merely insures such parent the right and opportunity to be heard in the proceeding when the propriety or wisdom of the proposed adoption is adjudicated. He is given no right of veto.

II. Nor should we hold the case triable de novo here. It is apparent the appellant did not so consider it. He assigns five "Errors Relied on for Reversal." See rule 344(a)(3), R. C. P. Two of them do require some factual review on the issue of the "best interest of the children." But his "Brief and Argument" discusses them as errors and not as subjects of review de novo.

There is no indication in the record that the case was tried as if in equity—except perhaps one lone instance where the court failed to rule on a motion to strike the answer of a witness as not responsive. That certainly is insufficient.

The majority opinion predicates its holding that the case is triable here de novo upon some language in In re Adoption of Karns, 236 Iowa 932, 939, 940, 20 N.W.2d 474, 478; and upon an assumed analogy between cases of this kind and habeas corpus cases involving child custody.

The Karns appeal involved a proceeding to set aside an already consummated adoption on the ground of failure to obtain the father's consent. The appeal was not from the order of adoption, but from the court's refusal to set it aside. The father there contended the trial court's finding as to the *wisdom* of the adoption was outside the pleaded issues, but we held the trial court properly considered the issue because it had been injected into the case by the father himself. No question seems to have been raised as to the nature of the proceedings.

In doing this the language quoted in the majority opinion was used. It does not warrant the inference drawn from it by

the majority and is consistent with an intention only to discuss the sufficiency of the evidence to support the trial court's decision as a matter of law or as bearing on whether there was any abuse of discretion in refusing to set aside the order of adoption.

The other argument advanced by the majority for trying the case de novo (the assumed analogy with child-custody cases in habeas corpus) is equally insubstantial though requiring more extended examination. The language of Justice Evans in Jensen v. Sorenson, 211 Iowa 354, 367, 233 N.W. 717, 723, is quoted.

That was a habeas corpus proceeding involving a question of child *custody*. It in turn cites another (similar) habeas corpus case, Barnett v. Blakley, 202 Iowa 1, 209 N.W. 412. It is true there is one important point in common between *child custody* and *adoption:* in both the welfare of the child is the paramount consideration.

But that fact does not demonstrate both custody and adoption are triable by the same kind of proceeding. Adoption involves the creation of rights of inheritance and other rights and obligations incident to the parental relation, in addition to the right of custody. I see no reason why the issue of the child's welfare may not be tried either at law or in equity, depending on the nature of the proceeding in which it arises. That situation is not unusual. Fraud, for example, is denounced by both law and equity and may be adjudicated in either, depending on the remedy sought.

III. The method of review by us is determined by the nature of the proceeding to be reviewed. "The Supreme Court shall have appellate jurisdiction only in cases in chancery, and shall constitute a Court for the correction of errors at law * * *." Constitution of Iowa, Article V, section 4.

This means of course that only equitable cases or those tried by equitable procedure can be reviewed by us de novo. All others are reviewable on errors. In re Estate of Custer, 229 Iowa 1061, 1064, 295 N.W. 848.

In order to determine whether the instant case was triable by equitable or by ordinary proceedings we must look to our general statutory provisions concerning procedure. We find that although "all forms of action are abolished" proceedings in civil actions

are either ordinary or equitable. Section 611.3, Iowa Code 1950, I. C. A. Equitable proceedings are allowed only in cases where courts of equity had jurisdiction before the adoption of·the Code and are mandatory in all cases where such equitable jurisdiction was exclusive. Code section 611.4. *"In all other cases, unless otherwise provided, the plaintiff must prosecute his action by ordinary proceedings."* (Italics supplied.) Code section 611.6. Under these plain provisions the proceedings to be reviewed here should be held ordinary and not equitable, triable on error and not de novo.

Courts of equity never assumed jurisdiction (exclusive or otherwise) to grant or establish the status of parent and child. Though the practice of adoption is ancient; and though in most countries from earliest times "some intervention on the part of the State and official sanction was required to give [it] legal effect" that (strange to say) was not true in England until the passage of the "British Adoption of Children Act" in 1926.' Encyclopaedia Britannica (14th Ed.) Title "Adoption", page 177. See 1 Am. Jur., Adoption of Children, section 3; 2 C. J. S., Adoption of Children, section 2.

Clearly we inherited no such chancery practice (or common law either) from England, since it did not exist there. In fact, no such judicial authority existed in Iowa until legislation in 1927 (Chapter 218, section 1, Acts of the Forty-second General Assembly). See section 10501-b1 et seq., Code of 1927. Prior to that time the act of adoption was consummated by the mere execution and filing of certain prescribed documents. Section 10496 et seq., Code of 1924; section 3250 et seq., Code of 1897; sections 2308–2310, Code of 1873; section 2600 et seq., Revision of 1860. No court action was required or provided. The proceeding was not judicial in character. Burger v. Frakes, 67 Iowa 460, 465, 23 N.W. 746, 25 N.W. 735. The entire subject of adoption with us is of statutory origin. Holmes v. Curl, 189 Iowa 246, 251, 178 N.W. 406; Morris v. Trotter, 202 Iowa 232, 234, 210 N.W. 131; In re Estate of Fitzgerald, 223 Iowa 141, 145, 272 N.W. 117. See 2 C. J. S., Adoption of Children, sections 34, 41; 1 Am. Jur., Adoption of Children, sections 25, 30, 50.

The historical difference between *adoption* and *custody* procedure is clear. Chancery had jurisdiction over the *custody* of

minors, quite independent of statute. Mollring v. Mollring, 184 Iowa 464, 469, 471 et seq., 167 N.W. 524, 528. See Johnson v. Levis, 240 Iowa 806, 809, 38 N.W.2d 115, and further authorities cited in the dissenting opinion in that case. This was on the ancient theory that chancery (representing the king) occupied the position of parens patriae in such cases and the decision as to custody was always subject to modification if changed conditions required. Power v. Power, 65 N.J.Eq. 93, 50 A. 111, 114. No such consideration attends the creation of parental status by adoption. When done it is final and there is no occasion for the court to retain jurisdiction in anticipation of possible future change of circumstances. Formerly, under our statute, the adopting parent might by misconduct lose the right of custody, but the child's acquired right of inheritance remained unimpaired. Code of 1873, section 2311; Code of 1897, section 3254; Code of 1924, section 10501. See, for more extended discussion of the power or jurisdiction of equity in relation to the custody of minors, Ex parte Badger, 286 Mo. 139, 226 S.W. 936, 939 et seq., 14 A. L. R. 286.

Of course the appeals in adoption cases since 1927 are not numerous. Indeed the right of appeal itself was seriously questioned as late as 1944. In re Adoption of Alley, 234 Iowa 931, 14 N.W.2d 742. I find no such appeal in which we have reviewed de novo. There seems to be no logical basis in our statutes or on historical considerations for holding such proceedings equitable in character. Until the legislature in some manner provides otherwise I think we should act in such cases as *"a court for the correction of errors."* Nor does there seem to be any sound reason for a different rule. Trial courts are just as competent to decide the question of the child's best interest as they are to adjudicate the myriad other fact questions coming before them in ordinary proceedings. See Fries v. Phillips, 189 Ark. 712, 74 S.W.2d 961; 2 C. J. S., Adoption of Children, section 41.

IV. There remains then but one other question here: the sufficiency of the evidence to support the trial court's finding that the adoption was in the best interest of the children. I think no one of us would contend the evidence on that issue is not in conflict. The trial court, after hearing the testimony and

seeing the parties, determined it in favor of the adoption "without any hesitancy." Whether we agree or disagree with the conclusion as a matter of fact is immaterial. There appears no such abuse of discretion as to justify our intervention. I would affirm.

OLIVER, C. J., and GARFIELD, J., join in this dissent.

GARFIELD, J. (dissenting)—I join in the dissent of Justice Smith (written after the writer's dissent). However, I desire to go further and point out that any fair review de novo of the evidence (assuming the propriety of such procedure) does not require or warrant the majority's holding that the boys' welfare will best be served by denying the adoption. Then Division II hereof discusses more fully than does Division I of Justice Smith's dissent the question of the claimed necessity for the father's consent to the adoption.

It may also be pointed out that the method of review here (whether de novo or on errors) depends upon provisions of our constitution and statutes which the majority ignores. Also the question of the necessity for the father's consent to the adoption is controlled by statute. It is significant that the majority also makes no reference to the statute that governs this question.

I. The majority seems to feel it more important to protect what it conceives to be the rights of appellant and to punish the boys' mother and her present husband (appellee) for their alleged "disdainful attitude" than to further the boys' welfare.

On the question of the boys' welfare the majority sees only one consideration in favor of the adoption—their right to inherit from appellee. And this is apparently considered unimportant for it is barely mentioned. It is plainly a valuable right to inherit from the owner of a quarter-section farm encumbered for less than half its value, in one of the best farming areas of the state, together with the livestock and equipment that go with the farm. We may take judicial notice the farm, like others, has substantially increased in value since the trial. However, the majority completely ignores vital considerations which favor this adoption. Under the trial court's decree these boys are entitled as of right to have appellee furnish them a suitable home, food, clothing, medical care, the advantages of an education and the countless

other obligations a parent owes his child. Certainly these are conducive to the boys' welfare.

Code section 600.6 provides: "Upon the entering of such decree, the rights, duties, and relationships between the child and parent by adoption shall be the same that exist between parents and child by lawful birth and the right of inheritance from each other shall be the same as between parent and children born in lawful wedlock."

Substantially this same statute has been in effect since the Code of 1860. In the main it accords with the law generally. 1 Am. Jur., Adoption of Children, section 52, page 652, states:

"Conversely, the obligation of the adopting parent is the same as if he were a natural parent, and hence he is bound to give the child the same support and maintenance and the same humane treatment to which it would be entitled if born to him in lawful wedlock, and he is subject to all civil remedies allowed against a natural parent to enforce proper maintenance of the child."

See also 2 C. J. S., Adoption of Children, section 56. Chehak v. Battles (Ladd, J.), 133 Iowa 107, 116, 117, 110 N.W. 330, 334, 8 L. R. A., N. S., 1130, 12 Ann. Cas. 140, says: "Moreover, the adoption contemplated by our statute includes far more than the mere right to inherit."

The majority's mandate takes from these boys their rights under the decree to have appellee furnish them a home and other appropriate support and leaves him under no duty in these respects. And this is done in order to preserve to appellant his right of visitation and to compel the boys to retain appellant's name. I think it most important to the boys' welfare that appellee become legally obligated for their care and maintenance. Appellant-father disclaims responsibility for the support of his sons and has contributed nothing thereto since August 3, 1949. It is true the boys' mother has their care and custody but she is without means.

Appellant is attempting to prevent this adoption for just two reasons. As a witness he says so more than once. He testifies:

"My object of being here today is because I don't want the names of the children changed and want the right to see them.

* * * I have at no time attempted to gain the custody of these children. I have not made an inquiry as to the type of home they are now in. * * * I just want my kids' name not changed and I want to see them, that is all."

It is not clear how it promotes the best interests of these boys to be compelled to retain appellant's name, nor does the majority so hold. It would seem the boys would be better off to be known among their associates by the name of the people with whom they make their home. Their enforced use of appellant's name advertises the fact they have come from a broken home—broken because of the finally adjudicated fact that appellant was guilty of such cruel and inhuman treatment as to endanger the life of the boys' mother.

The majority refers to appellant's "right" to have his sons bear his name. I think there is no such right if the boys' use of appellant's name does not contribute to their welfare. The boys' best interests should not be subordinated to any right a divorced father, deprived of custody, may have that the boys bear his name. As stated in an adoption case, In re Jackson (Rosenberry, C. J.), 201 Wis. 642, 645, 231 N.W. 158, 159, "* * * no one has rights in the custody of a child superior to the right of the child to have its best interest and welfare promoted."

I think the controlling question here is whether under the evidence it promotes the best interests of these boys to continue appellant's right to visit them at such "reasonable times as may be convenient" (as the divorce decree states) and to compel them to retain appellant's name, on the one hand, more than it does on the other hand, to deny such right of visitation, permit the boys to use appellee's name and grant them the obvious advantages, some of which are above referred to, which would result from the adoption.

Some of the matters the majority holds outweigh the advantages of the adoption have little if any bearing on the question of the boys' welfare. None is a valid and controlling argument against the adoption. The majority first refers to "the natural and healthy relationship which they will otherwise have with their father." To accept this as a certain consequence of denying

the adoption seems utterly unwarranted. There is no fair prospect a reversal will result in any such relationship as the majority assumes.

The second consideration the majority mentions as detrimental to the boys' welfare if the adoption were granted is "the disdainful attitude of the mother and her present husband toward the Iowa law which prohibits remarriage after the divorce within one year." Perhaps the mother and appellee are subject to criticism for marrying in Missouri six days less than six months after the divorce decree. However, that marriage was not, as the majority implies, in violation of our law but was perfectly valid. Dudley v. Dudley, 151 Iowa 142, 130 N.W. 785, 32 L. R. A., N. S., 1170; Farrell v. Farrell, 190 Iowa 919, 925–927, 181 N.W. 12; Webster v. Modern Woodmen, 192 Iowa 1376, 1380, 186 N.W. 659; Swift v. Swift, 239 Iowa 62, 73,. 29 N.W.2d 535, 541; annotation 32 A. L. R. 1116, 1118.

Referring to an out-of-state marriage four months and seventeen days after a divorce, Dudley v. Dudley, supra, states (page 146 of 151 Iowa) it "does not constitute such a breach of good morals or of public policy as to brand her with unfitness for the custody of her child." (The majority's claim that no question of the custody of the children is here involved will be later considered.)

In Farrell v. Farrell, supra, a divorced wife who married again in Missouri within the year was denied relief by the trial court in part because of her " 'contemptuous disregard for the laws of this state' " (page 922 of 190 Iowa). ("Contemptuous" is a synonym of "disdainful.") In reversing, we state (page 927 of 190 Iowa), "It is not to her discredit, however, that she sought a *legal* marriage * * *."

This is not a case where another man broke up the home, then married the divorced wife. Appellee did not know his wife· until two months after the divorce.

The claimed attitude of the mother and appellee toward the Iowa law pertaining to remarriage (there is no evidence of their attitude except the fact of marriage)· is not substantial proof the adoption would be against the boys' welfare. Under the record this marriage actually proved for the best interests of these boys.

For one thing it resulted in·a better home for them than they ever had before. The mother testifies, "I know they are happier and have a better home than they ever had, and father." This testimony is not disputed. (Although the majority purports to consider the cause de novo and says a review of the evidence is required, it virtually ignores the mother's testimony.)

The asserted disdainful attitude of the mother and appellee toward appellant's right to visit his sons is also given as a reason why the adoption would be against the boys' best interests. It is probably true the mother and perhaps appellee are subject to criticism for their unwillingness to permit appellant to visit the boys. However, there is at least some justification, to which the majority does not refer, for their attitude in this regard.

The mother says: "Mr. Perkins is addicted to liquor. There is very few times he is sober more than two days at a time. After my divorce Mr. Perkins came to the house on different occasions. One time I had to get the police for protection. I had people living with me to help protect myself and the children. The police took him away that time to the police station and held him over night. There was another time he came up there with the police and gained entrance into the house through the policeman to threaten me."

Appellant testifies of the time he went to the house "and asked for the kids" when his former wife "called the cops", as he says, "I would say it was nine o'clock." At best it is doubtful if 9 p.m. was a reasonably convenient time for appellant to visit the boys, then ages seven and eleven. Appellant admits that on another evening after the divorce he started for the home of his former wife and children when he was intoxicated and later pleaded guilty to the crime of driving while intoxicated on that occasion. He says, "I don't remember if I attempted to see the children that day or not." Referring to his use of liquor appellant testifies, "I don't drink a lot, just average. I don't drink any more than the ordinary guy does."

Regarding visits of appellant with the older boy before the mother's marriage to appellee, the mother says: "The older boy would come home after seeing him and cry and say, 'Mom there is something in my head and I don't know what it is.' And he

missed school almost half a day a week while we were in Ames when he was right where he could see him, and since coming to Jewell last year he had a perfect attendance in school and his grades were up to average. And they are very happy and content."

The mother also testifies: "Since we moved west of Jewell Mr. Perkins called on these children in school. The children came home and told me about it. They were all worked up and said their Dad was going to come and get them in order to make them happy, which they didn't need because they are happier now than they have ever been. And, they went down in their grades for about a week and were very nervous and upset. And he told them untrue things that he was going to get them and they cried and were very worked up about it."

Not only does the above uncontradicted testimony furnish reasonable explanation for the unwillingness of the mother and appellee to encourage visits from appellant to the boys but it demonstrates that continuing appellant's right of visitation will not so promote the boys' welfare as to warrant denying the adoption. Certainly the "father's guidance and companionship" of which the majority speaks have not been conducive to the boys' welfare on several occasions in the past.

The majority assigns as another controlling reason why the adoption would be contrary to the best interests of the boys "the comparatively short time" since appellee's marriage. Appellant has made no such contention. A year and ten months have elapsed since the marriage, during which the boys have lived with their mother and appellee. The family has an established, desirable farm home. No one says a word against it. The boys have always lived with their mother. They have seen their father twice between the time of appellee's marriage and the trial. Before the divorce appellant was away in the service, to his credit, for extended periods.

The law requires a child to live in the proposed home twelve months before the adoption unless the court is satisfied the home and the child are suited to each other, but even that residence may be waived where as here petitioner is married to a parent of the child. Code section 600.2. It seems plain the claimed short time since this marriage is not a valid ground for reversal.

"The interest of appellant in his sons" is another reason the majority gives for its conclusion the adoption would be contrary to the boys' welfare. Appellant professes much interest in his sons. However, his testimony previously quoted indicates this interest is almost wholly in continuing his right of visitation and in requiring the boys to use his name. In the divorce action or otherwise he has never sought custody of the boys and has contributed nothing to their support since nearly two years ago. Appellant's profession of interest in the boys is weakened by his failure to contribute more to their welfare.

Is the mother's interest in her sons to receive no consideration? Apparently the majority gives it none. She has had the burden of the sons' care and support all their lives and especially since August 3, 1949, when appellant made his last payment of support money. Certainly the mother's interest in her sons has contributed much more to their welfare in the past than has the interest of the father.

It is true the boys are "of ages at which the need of a father's guidance and companionship is increasingly important." It is apparent any guidance and companionship fairly to be expected from appellant will be much limited because of the divorce due to his cruelty, the award of custody to the mother and the events that followed. There is little reason to expect more guidance and companionship from appellant in the future than he has shown in the past. This very need for guidance and companionship is a consideration in favor of, not against, the adoption. Appellee would have much stronger incentive to treat these boys as a father does his sons if the adoption were granted.

The findings of the able trial court, who had the benefit of seeing these parties, state:

"The primary objective in this proceeding is to determine what should be done for the best interest of these children so as to provide for them the greatest opportunity for their future care, guidance and development. The court answers this question without any hesitancy after hearing the evidence. The petitioner and the mother have a home and they possess ample means for the care and education of the children with suitable and satisfactory surroundings for their physical and moral develop-

ment. The natural father, while he says he has affection for the boys, has neither the surroundings nor the background to give them the adequate supervision, training or home life so necessary to them."

With reference to the above the majority makes these amazing statements:

"* * * the trial court's determination is considerably weakened * * * by its apparent thought that in some manner the custody of the children was involved. * * *

"Counsel for the petitioner * * * has followed the court down this misleading road and argues strenuously that the natural father has no adequate home. No such question is involved. * * * we must assume * * * they will have the same care and affection that they would have if the adoption decree were permitted to stand."

And the majority again criticizes *the trial court and the appellee* for thinking that a question of custody as between mother and father is involved. The criticism is unwarranted. *Appellant* injected into the hearing below testimony that if he had the custody of the children he knew he could provide for them. He says he is one of several roomers in a rooming house in Ames and has no relatives in this part of the country. He also testifies: "I would like to have the custody of these children; * * * I think this is a good place to take these two boys."

One of appellant's claimed errors relied upon for reversal is: "The court erred in ruling that resistor had neither the surroundings nor background for adequate supervision of the minors." The argument in support of this alleged error does not suggest that no such question is involved. The trial court should be permitted to consider evidence offered by appellant and appellee should be allowed to respond to appellant's argument without being charged by the majority with misconceiving the case.

The trial court would have been derelict in his duty if he had not considered evidence as to the suitability of the home of appellee and the mother and their ability to rear and educate the boys. Such testimony was relevant and proper. It is the trial court's duty in adoption cases to order an investigation "to de-

termine whether the proposed foster home is a suitable one for the child" unless the investigation (in certain instances) is waived by the court. Code section 600.2; In re Adoption of Burkholder, 211 Iowa 1222, 1224, 233 N.W. 702, cited by the majority. No petition for adoption may be granted unless "upon the hearing the court shall be satisfied * * * the petitioners are able to properly rear and educate the child * * *." Code section 600.5. When a child is adopted he is adopted into the home of the petitioner as well as by him.

While adoption is largely a question of status the right to the child's custody is an important incident to that status. This case then clearly involves the right to the custody of these boys along with other rights and obligations. Under the trial court's decree appellee is entitled to custody of the boys. This is the effect of Code section 600.6 previously quoted. See also 1 Am. Jur., Adoption of Children, section 52, page 651; 2 C. J. S., Adoption of Children, section 56b; Chehak v. Battles, supra, 133 Iowa 107, 117, 118, 110 N.W. 330, 8 L. R. A., N. S., 1130, 12 Ann. Cas. 140; Burger v. Frakes, 67 Iowa 460, 470, 23 N.W. 746, 25 N.W. 735; Spencer v. Franks, 173 Md. 73, 195 A. 306, 114 A. L. R. 263, 268, 269 (where the natural mother claimed the right to visit her adopted child. Much in the opinion supports this dissent.); Petition of Shinkonis, 312 Mich. 199, 20 N.W.2d 159, 161.

We have recognized that adoptive and custodial rights of parents are closely related. Of them we say in Rubendall v. Bisterfelt, 227 Iowa 1388, 1391, 291 N.W. 401, 402: "It may be noted that although these rights are regarded as being separate and distinct they are closely interrelated and at times appear to blend into each other."

A grandmother opposed the adoption in In re Adoption of Burkholder, supra, 211 Iowa 1222, 1225, 1226, 233 N.W. 702, 703, on the ground "that, because of unfriendliness between the petitioners and herself * * * she will be deprived of the privilege of associating with her grandchild." We held: "Without doubt, petitioners have furnished a good home and proper care for the child, and are proper persons to have such care in the future. The interests of the child are paramount, and it is in her interest that the court decreed her adoption."

And in In re Adoption of Chinn, 238 Iowa 4, 9, 25 N.W.2d 735, 738, cited by the majority, a divorced father opposed the adoption in part because it would deprive him of his rights under the divorce decree to "visit said child at all reasonable times" and to take the child to his home in another town for as long as one week every three months. We reversed the trial court's denial of the adoption, stating:

"It is suggested the granting of the adoption would modify provisions of the divorce decree granting the father the right to visit and be visited by the child * * *. Adoption does change the status of a child and may affect incidents of a divorce decree involving parental duties and privileges. But where the conditions and circumstances prescribed by chapter 600 as warranting adoption are shown to exist, the fact that the adoption may affect certain incidents of a prior divorce decree is not a bar to such adoption. [Citing authorities.]"

(In the Chinn case, supra, the mother remarried just thirty-eight days after her divorce and the petition for adoption was filed nineteen days after the remarriage.)

The majority's statement "we must assume" the boys "will have the same care and affection" as if the adoption were permitted ignores several matters. For example, the greater incentive appellee would have, as well as legal obligation, to care for and love them if he were their father by adoption.

The majority mentions its "particular concern for the preservation of the family relationship" as an added reason for denying the adoption. Just how a reversal will preserve the family relationship is not apparent. The Perkins family relationship was broken by the divorce decree based on such cruelty of appellant as to endanger the life of the boys' mother. Denying the adoption and continuing appellant's right of visitation will tend to disrupt the Green family without either preserving the Perkins family relationship or promoting the boys' welfare.

II. I think appellant's consent to the adoption is not required. Adoption is statutory. See authorities cited in Division I hereof, also In re Adoption of Chinn, supra, 238 Iowa 4, 9, 25 N.W.2d 735, 738. Code section 600.3 governs the question of

consent. It states: "The consent of both parents shall be given to such adoption unless * * * the parents are not married to each other * * *. If not married to each other, the parent having the care and providing for the wants of the child may give consent."

It is clear that since the divorce appellant and his former wife have not been married to each ·other. In re Adoption of Alley, 234 Iowa 931, 933, 14 N.W.2d 742, 744, and citations; In re Adoption of Karns, 236 Iowa 932, 935, 20 N.W.2d 474, 476. The majority does not hold otherwise. In the Alley case, supra, we found nothing of doubtful meaning in what is now section 600.3. This portion of the Alley opinion is quoted with approval in Iowa-Illinois Gas & Elec. Co. v. City of Bettendorf, 241 Iowa 358, 361, 41 N.W.2d 1, 3, in which all justices concurred.

Nor can there be any fair question that appellant's former wife is the parent having the care of her sons. "The word 'care' is used in the statute in the sense of charge or oversight, implying responsibility for safety and prosperity. As used in the statute it generally includes custody as provided for in a divorce decree. "The mother was awarded the custody of the child." In re Adoption of Chinn, supra, 238 Iowa 4, 8, 25 N.W.2d 735, 737.

The stipulation in the divorce case, approved and incorporated in the divorce decree, states "plaintiff [mother] shall have the absolute custody of the minor children * * *." The evidence shows the mother has had the boys' care constantly since the divorce.

It is equally plain the mother is "the parent * * * providing for the wants of the child(ren)." That appellee has greatly assisted in providing for their wants since the boys and their mother came into his home does not make appellant's consent to the adoption required. In re Adoption of Karns, supra, 236 Iowa 932, 936, 937, 20 N.W.2d 474, 477.

The majority's holding that appellant's consent to the adoption is required because he turned over to his former wife at the time of the divorce his interest in the furniture and homestead first calls for an examination of the record. Both the stipulation and decree in the divorce suit state the monthly pay-

ments of $60 are an allowance "for the support, maintenance and education" of these minors "until * * * plaintiff remarries." Under both the stipulation and decree appellant's obligation to make these payments ended when his former wife remarried on September 12, 1949. Actually, as stated, appellant made his last payment on August 3.

The majority at least implies that the furniture and home belonged to appellant. Actually the stipulation states that both the homestead and furniture were owned by appellant's former wife and appellant. It was doubtless the product of their joint efforts. The wife says "It would probably cost $400 or $500 for me to buy it [furniture]."

The home was mortgaged for $6300 and the stipulation requires appellant's former wife to save him "harmless from the payment of such mortgage." Payments on the mortgage were $54 a month—$6 less than appellant's monthly payments of support money. After putting in a new furnace at a cost of $485 and painting at a cost of $200, the wife sold the house in September 1949 for $8500 subject to the mortgage. Whether the furniture went to the purchaser with the house does not appear. Thus she received a little over $1500 for the entire equity in the home, half of which was hers before the divorce. In view of her agreement to save appellant harmless on the mortgage his interest in the home might have proven a liability to the wife rather than an asset.

There is no evidence appellant's former wife is "retaining the furniture and the proceeds of the home." Referring to the summer of 1949, before her marriage to appellee, she testifies, "I was working during that time; I had to. * * * Other than the $60 he paid there was nothing further coming from Mr. Perkins." Appellant's income was $280 a month.

That the boys' mother received at the time of the divorce appellant's share of the furniture and equity in the home does not, under the circumstances here, indicate in this proceeding she was not the parent providing for the boys' wants. After more than thirteen years of marriage to appellant *she* should be entitled to that much from him for herself upon establishing her right to a divorce.

Under the majority's reasoning a divorced mother who provides for the wants of children whose absolute custody was awarded her by the decree is powerless to consent to their adoption if she received something from the natural father at the time of the divorce even though there is no evidence that what was received was intended to provide for the children's wants. Further, the effect of the majority's Division III is that the consent of a divorced father to the adoption is forever a requisite thereto if at the time of the divorce the mother acquires something from him which might then be used for the children's benefit even though it has long since been exhausted.

Rubendall v. Bisterfelt, supra, 227 Iowa 1388, 291 N.W. 401, does not in my opinion require a holding that appellant's consent to the adoption is required. In the cited case the father was obligated to make monthly payments for the child's support until he became sixteen. The decree specifically recognized the father's "engagement to assist in providing for the wants of the child in the future." (Page 1390 of 227 Iowa.) Under the divorce decree here, as stated, appellant was under no duty to provide for the children's wants after the mother's remarriage and he has made no such provision for nearly two years.

After our decisions in In re Adoption of Alley, 234 Iowa 931, 14 N.W.2d 742, In re Adoption of Karns, 236 Iowa 932, 20 N.W.2d 474, and In re Adoption of Chinn, 238 Iowa 4, 25 N.W.2d 735, all supra, the Fifty-second General Assembly, in 1947, overhauled and made a number of changes in our adoption statutes. The journals of that session show there was introduced an amendment to Code section 600.3 plainly designed to require consent of a divorced father to the adoption. The amendment was defeated. The Fifty-second General Assembly, chapter 281, section 4, amended section 600.4, however, to provide for *notice* of the adoption proceedings "to a divorced parent not having custody of the child."

It is therefore plain the legislature did not intend to require *consent* of a divorced parent not having custody unless he is "providing for the wants of the child" as stated in section 600.3.

A carefully written note entitled "Consent in Adoption in Iowa" in 33 Iowa Law Review 678, 685, states as a conclusion:

"The power of an absolute veto of an adoption petition by a parent should be recognized only under extraordinary circumstances, for to allow such a power in many cases might prevent the court from providing for the best interests of the child. Problems arising from divorce and family settlements cannot be solved by iron-clad rules of law, because one party is often motivated only by the desire to injure the other party. An absolute veto might be a means by which a vengeful parent could obstruct a normal family readjustment."

I think the majority opinion demonstrates the wisdom of this quotation.

I would affirm.

OLIVER, C. J., joins in this dissent.